**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SHERIDAN AND MURRAY, LLC and THOMAS W. SHERIDAN,<br><br>                    Plaintiffs,<br><br>v.<br><br>ROBERTS AND ROBERTS, and RANDELL C. ROBERTS,<br><br>                    Defendants. | Civil Action No. 19-467 (RBS) |

**DEFENDANTS' REPLY[1] TO PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION
OR, IN THE ALTERNATIVE,
MOTION TO TRANSFER VENUE TO THE EASTERN DISTRICT OF TEXAS**

I.      SETTING THE RECORD STRAIGHT……………………………………………………1

      A.     In an effort to deflect attention from their evolving story of the referral agreement, Defendants distort the jurisdictional facts................................................3

      B.     Plaintiffs falsely accuse Defendants of failing to disclose their contacts with Pennsylvania and failing to address that evidence in their Motion. .....................4

      C.     Plaintiffs falsely claim Defendants were "begging" Plaintiffs and "doggedly" pursuing Plaintiffs to accept the referral...........................................................5

      D.     Plaintiffs falsely contend that Mr. Roberts "relentlessly" requested that Mr. Sheridan co-counsel the Burgess case with Mr. Roberts in Pennsylvania, and that Mr. Sheridan "repeatedly" declined Mr. Roberts' request to co-counsel. ..................................8

      E.     Plaintiffs falsely claim that Defendants unsuccessfully attempted to "extract" a "quick pre-suit settlement" from Clark Electrical Contractors, Inc.....................9

---

[1] Defendants are acutely aware of the length of this Reply. *Half* of this Reply, however, was necessary to correct the record before replying to Plaintiffs' legal argument.

i

F.  Plaintiffs falsely claim that Defendant represented that they "would remain involved in handling the Pennsylvania lawsuit...................................................................10

G.  Plaintiffs' representation that this referral occurred "on the eve of the expiration of the statute of limitations" is not credible or relevant to the jurisdictional facts. ...11

H.  Plaintiffs knowingly misconstrue Mr. Roberts' offer to refund a portion of his referral fee to help Mr. and Mrs. Burgess, and now use it to falsely contend that Mr. Roberts offered to waive his law firm's entire referral fee regardless of the outcome of the Burgess case...............................................................................................11

II.  REGARDLESS OF WHETHER THERE IS JURISDICTION IN PENNSYLVANIA, THIS CASE SHOULD BE TRANSFERRED TO THE EASTERN DISTRICT OF TEXAS FOR THE CONVENIENCE OF ALL THE KEY WITNESSES .............................................................................................13

III.  REGARDLESS OF WHETHER THERE IS JURISDICTION IN PENNSYLVANIA, THIS CASE SHOULD BE TRANSFERRED IN THE INTEREST OF JUSTICE TO AVOID HARMING THE CLIENTS ..........14

IV.  TEXAS HAS JURISDICTION OVER PLAINTIFFS BECAUSE IT IS UNDISPUTED THAT PLAINTIFFS CONDUCTED RELATED BUSINESS IN TEXAS .......................................................16

V.  PLAINTIFFS MISLEAD THIS COURT ABOUT THE U.S. SUPREME COURT'S RECENT NARROWING OF PERSONAL JURISDICTION DOCTRINE .............................................................17

VI.  THE NINTH CIRCUIT RECENTLY RECOGNIZED THAT AN ATTORNEY REFERRAL AGREEMENT IS NOT THE TYPE OF CONTRACT THAT CREATES PERSONAL JURISDICTION .......................19

VII.  PLAINTIFFS RELY UPON CASES THAT PRE-DATE THE U.S. SUPREME COURT'S RESTRICTING OF PERSONAL JURISDICTION, AND WHICH ARE NOT ANALOGOUS TO THIS CASE...............20

VIII.  ASSUMING PLAINTIFFS FACTUAL MISREPRESENTATIONS ARE TRUE, THERE STILL IS NO PERSONAL JURISDICTION OVER DEFENDANTS IN PENNSYLVANIA......................................22

A.  Defendants' activities in Texas did not create jurisdiction in Pennsylvania. ........22

B.  Similarly, any alleged 'settlement discussions' did not create personal jurisdiction. ....................................................................................................23

IX.  CONCLUSION................................................................................................24

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| SHERIDAN AND MURRAY, LLC and THOMAS W. SHERIDAN, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERTS AND ROBERTS, and RANDELL C. ROBERTS, <br><br> Defendants. | Civil Action No. 19-467 (RBS) |

**DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**
**FOR LACK OF PERSONAL JURISDICTION**
**OR, IN THE ALTERNATIVE,**
**MOTION TO TRANSFER VENUE TO THE EASTERN DISTRICT OF TEXAS**

Defendants' Motion to Dismiss extensively briefed the jurisdictional and transfer-related issues in this case.  This Reply addresses new arguments raised by Plaintiffs and new points of law as well as corrects the record where necessary.  To the extent that an argument is not addressed again in this Reply, the Court should not infer that Defendants are abandoning their position.[2]

## I.   SETTING THE RECORD STRAIGHT

To color this Court's view of the jurisdictional issues, Plaintiffs' would have this Court believe the following:

---

[2] The accompanying Second Amended Declaration of Randell C. Roberts is identical to his preceding Declaration, with the addition of Paragraph Nos. 76, 77, and 78.  With respect to the accompanying Defendants' Amended Exhibit List, all but two of these exhibits were previously submitted with Defendants' Motion to Dismiss  Plaintiffs' Amended Complaint.  They are resubmitted now in a version that is highlighted in yellow to draw the Court's attention to the relevant portions of the documents.  It may be helpful to use this complete set of exhibits when reading Defendants' Motion to Dismiss and Reply as well as the Second Amended Declaration of Randell C. Roberts.  Reference to the Second Amended Declaration of Randell C. Roberts and Defendants' Amended Exhibit List will provide the Court with the facts and documents supporting Defendants' Motion to Dismiss and Reply.

1

Mr. Roberts "desperately needed a licensed Pennsylvania attorney to file suit"[3] for a man who was a quadriplegic as a result of an oil field accident.  After being repeatedly told by Mr. Sheridan—more than a year before the expiration of the statute of limitations—that Mr. Sheridan did not wish to co-counsel with Mr. Roberts, Mr. Roberts became obsessed with Mr. Sheridan and "doggedly" and "relentlessly pursued" and "begged" Mr. Sheridan to accept the referral of a case with catastrophic damages.[4]  Mr. Roberts was so enamored with Mr. Sheridan, that Mr. Roberts "expressly agreed to waive his entire referral fee whatsoever" to "entice" Mr. Sheridan's association.[5]  But, Mr. Roberts insisted that he and his law firm retain "joint responsibility"[6] for the clients without renumeration.  Out of sympathy for his Texas colleague, Mr. Sheridan agreed to pay Mr. Roberts a forty percent (40%) referral fee, which was higher than the customary one-third (1/3) referral fee Mr. Sheridan normally pays referring attorneys.[7]  Mr. Sheridan then "mistakenly and incorrectly"[8] drafted a referral agreement *and* an email, both of which provided for Mr. Roberts to receive forty percent (40%) of the gross attorney's fees.  Neither Mr. Sheridan nor his firm noticed this drafting error for almost four years.[9]  In addition, neither Mr. Sheridan nor his firm ever noticed that the clients' two Consents to Refer, which Mr. Sheridan originally received with his executed employment contracts four years earlier,[10] and which expressly provided for Mr. Sheridan's firm to pay Mr. Roberts' firm

---

[3] *See* Plaintiffs' Opposition at 1.  The Commonwealth of Pennsylvania currently has more than 49,000 licensed attorneys.

[4] *See* Plaintiffs' Opposition at 1, 14, and 15.

[5] *See* Plaintiffs' Opposition at 1, 2, 13, 15, 21, 23 n.12, and 25; Declaration of Plaintiff Thomas W. Sheridan at ¶¶ 23, 28, 34, and 40.

[6] *See* Plaintiffs' Opposition at 14, 15, 28, and 29.

[7] *See* Declaration of Plaintiff Thomas W. Sheridan at ¶ 22 n.4; Second Amended Declaration of Randell C. Roberts at ¶ 42.

[8] *See* Plaintiffs' Complaint for Declaratory Relief [Docket No. 1] at ¶ 15; Plaintiffs' First Amended Complaint for Declaratory Relief [Docket No. 7] at ¶ 22; Declaration of Plaintiff Thomas W. Sheridan at ¶ 43.

[9] *See* Plaintiffs' Complaint for Declaratory Relief [Docket No. 1] at ¶ 16; Plaintiffs' First Amended Complaint for Declaratory Relief [Docket No. 7] at ¶ 23.

[10] *See* Second Amended Declaration of Randell C. Roberts at ¶ 50; Plaintiffs' Ex. Z.

forty percent (40%) of the total attorney's fee.[11]

Nothing could be further from the truth—and Plaintiffs' story does not make sense.  Plaintiffs' response in opposition also asserts that Defendants "tellingly omitted" or "failed to disclose" numerous facts, "misrepresented" the facts, allege facts that "are demonstrably untrue," cite emails "out-of-context," and "selectively assembled [documents] to create a false narrative."[12]  These allegations about Defendants' conduct before this Court warrant a direct and unvarnished reply.

### A. In an effort to deflect attention from their evolving story of the referral agreement, Defendants distort the jurisdictional facts.

A review of the pleadings and exhibits produced to date reveals a continuing evolution in the Plaintiffs' version of the referral agreement.[13]  Before filing this lawsuit, Mr. Sheridan contended in writing that he was justified in *changing* the referral agreement on February 7, 2018.[14]  When Mr. Sheridan and Plaintiffs filed their Complaint for Declaratory Relief, they changed their story to contend that the original referral agreement, which was made on September 10, 2014, *always* limited Defendants' referral fee to only forty percent (40%) of the attorney's fee recovered from only one defendant in the underlying litigation.[15]  After Defendants filed the original Declaration of Randell C. Roberts, which attached exhibits supporting Mr. Roberts' account of the referral agreement, Plaintiffs then amended their Complaint to plead "novation."  More specifically, Plaintiffs plead in the alternative that the parties *did* agree to change the agreement on February 7, 2018, and that the change is binding on the parties.[16]  In their latest filing, Plaintiffs now contend that Defendants agreed

---

[11] *See* Plaintiffs' Ex. Z; Defendants' Ex. G.
[12] *See* Plaintiffs' Opposition at 1, 2, 3, 13, 14, 16, and 21.
[13] Defendants continue to amend the Declaration of Randell C. Roberts as additional facts are needed to rebut Plaintiffs' changing story.
[14] *See* Second Amended Declaration of Randell C. Roberts at ¶ 69; Defendants' Ex. M.
[15] *See* Second Amended Declaration of Randell C. Roberts at ¶ 71; Plaintiffs' Complaint for Declaratory Relief [Docket No. 1] at ¶¶ 14-16.
[16] *See* Plaintiffs' First Amended Complaint for Declaratory Relief [Docket No. 7] at ¶¶ 44-60.

to waive any referral fee, regardless of the outcome of the case.[17]

**B. Plaintiffs falsely accuse Defendants of failing to disclose their contacts with Pennsylvania and failing to address that evidence in their Motion.[18]**

Paragraphs 33 and 35 of the Amended Declaration of Randell C. Roberts, which was originally filed with this Motion, expressly disclosed the contacts that Defendants had with Pennsylvania agencies and witnesses in the course of investigating the lawsuit that Defendants filed in Texas. Pages 14 and 15 of Defendants' Memorandum of Law in support of their Motion expressly addressed why these contacts did not create personal jurisdiction over Defendants in this action.

Plaintiffs also omit portions of the exhibits they submit to this Court to distort the jurisdictional facts. For example, Defendants sent a letter to Christopher Clark with Clark Electrical Contractors, Inc. enclosing "a copy of the Petition for Rule 202 Pre-Suit Deposition to Investigate Claims" in the Texas litigation.[19] Plaintiffs, however, only provided this Court with the cover letter to Mr. Clark (Plaintiffs' Exhibit H), and then brazenly implied to this Court that Defendants attempted to take the deposition of Mr. Clark in Pennsylvania.[20] The Petition enclosed with that letter clearly stated that the deposition being sought was that of the corporate representative of Mr. Burgess' Texas employer, Patterson-UTI Drilling Company LLC, in the Texas litigation.[21] Rule 202 of the Texas Rules of Civil Procedure required Defendants to provide all persons, who may have an interest in the Texas litigation, with notice of the depositions being taken in Texas.[22] Plaintiffs were previously provided by Mr. Roberts with a disk containing the actual Petition and the cover letter to Mr. Clark.[23]

---

[17] *See* Plaintiffs' Opposition at 1, 13, 15, 21, 23 n.12, and 25.

[18] *See* Plaintiffs' Opposition at 1.

[19] *See* Defendants' Ex. O.

[20] *See* Plaintiffs' Opposition at 6.

[21] *See* Defendants' Ex. O at ROBERTS_000070.

[22] *See* Rule 202.3(a) of the Texas Rules of Civil Procedure.

[23] *See* Plaintiffs' Ex. Z. All of the exhibits relied upon by Plaintiffs were contained on the disk sent by Defendants to Plaintiffs or otherwise forwarded by Defendants to Plaintiffs. *See id.* Most of these exhibits do not relate to the jurisdictional facts at issue, and to the extent that they relate to jurisdictional facts, those facts were disclosed and addressed in Defendants' pending Motion.

Plaintiffs, who apparently did depose Mr. Clark in Plaintiffs' Pennsylvania litigation, and who have been in contact with Mr. Clark's attorney throughout that litigation, undoubtedly also knew from those sources—before they submitted their Opposition to this Court—that Defendants never attempted to take Mr. Clark's deposition.

**C. Plaintiffs falsely claim Defendants were "begging" Plaintiffs and "doggedly" pursuing Plaintiffs to accept the referral.[24]**

Mr. Roberts did not press Mr. Sheridan to accept the referral—Mr. Roberts pressed Mr. Sheridan to make a decision in a timely manner as to whether Mr. Sheridan still wanted the referral. It is undisputed that it was Mr. Sheridan who first reached out to Mr. Roberts on November 15, 2013, long after they had met at the seminar in California in September 2013.[25] It is also undisputed that after Mr. Sheridan explained to Mr. Roberts the benefits of Pennsylvania law, Mr. Roberts began consulting with lawyers in Pennsylvania to determine the best options for his clients.[26] It would be natural for Mr. Roberts to generally prefer to associate Mr. Sheridan over other Pennsylvania lawyers because Mr. Roberts was already acquainted with Mr. Sheridan from their meeting in California. It would also be natural for Mr. Roberts to press Mr. Sheridan to make a decision since Mr. Sheridan had undertaken investigation of the case.[27]

Plaintiffs contend that Defendants cite emails "out-of-context" and "selectively assembled [emails] to create a false narrative."[28] Plaintiffs, however, did not provide the Court with a complete copy of the initial email chain between Mr. Sheridan and Mr. Roberts that Plaintiffs rely upon. This was the email chain setting up the initial telephone call between Mr. Sheridan and Mr. Roberts on December 3, 2013. A complete copy of that email chain is attached as Defendants' Exhibit N. This

---

[24] *See* Plaintiffs' Opposition at 1 and 14.
[25] *See* Defendants' Ex. B at ROBERTS_000005; Second Amended Declaration of Randell C. Roberts at ¶ 40; Declaration of Plaintiff Thomas W. Sheridan at ¶ 11.
[26] *See* Plaintiffs' Opposition at 12 n.6; Plaintiffs' Ex. L.
[27] *See* Defendants' Ex. C.
[28] *See* Plaintiffs' Opposition at 1 and 16.

complete email chain shows that it is Plaintiffs who have cited emails "out-of-context" and "selectively assembled [emails] to create a false narrative."  For example, Plaintiffs claim that on "December 3, 2013: *Defendant Roberts emails Plaintiff Sheridan requesting a telephone call*. . . ." (emphasis added). The complete email chain (Defendants' Exhibit N) clearly shows that it was Mr. Sheridan who requested the initial telephone call:

**November 15, 2013 (First Email and Contact):**

> Mr. Sheridan:  "Randy. . . *Please give me a call* to discuss the case or feel free to email the information you would like me to review" (emphasis added).

> Mr. Roberts:  "Hi Tom. . . I will email some information on that case to you later next week and then we can talk. . . . – Randy"

**November 27, 2013:**

> Mr. Roberts (after being prompted by Mr. Sheridan):  "I haven't forgotten you Tom.  I hope to get back to you next week.  Happy Thanksgiving.  – Randy"

> Mr. Sheridan:  "Randy, Thanks.  *I look forward to hearing from you.*  Happy Thanksgiving!  Tom" (emphasis added)

**December 3, 2013:**

> Mr. Roberts: "Tom, when would be a good time for me to call you this week?. . . . – Randy"

> Mr. Sheridan:  "Randy, would 2:30 pm EST work for you today for a call?  Please let me know.  Thank you, Tom"

> Mr. Roberts:  "Yes; I will call you at 2:30 EST today."

> Mr. Sheridan:  "Great."

Similarly, Mr. Sheridan misrepresents in his Declaration that it was Mr. Roberts about who requested the initial telephone call on December 3, 2013.[29]  The fact that Mr. Sheridan requested the first

---

[29] *See* Declaration of Plaintiff Thomas W. Sheridan at ¶¶ 13, 14, and 15 ("Just over two weeks later, on December 3, 2013, without any additional communications from me, Mr. Roberts sent another email, again requesting an opportunity to further discuss his Pennsylvania case. . . . In response to the above email, I agreed to participate in a December 3, 2013, telephone call with Mr. Roberts. . . . During this December 3, 2013, telephone call initiated by Mr. Roberts. . . .").

telephone call – after emailing Mr. Roberts – would have been obvious to this Court if Plaintiffs had produced the entire email chain under Plaintiffs' Exhibit M.

Placing the emails, which were selectively produced by Plaintiffs, in three basic categories also puts these emails in their proper context.  In this regard, it must be remembered that it was Mr. Sheridan who requested on November 15, 2013, that Mr. Roberts forward the relevant file materials to Mr. Sheridan and then made a second request to review the file materials in their initial telephone conference on December 3, 2013.[30]

**Category No. 1:**  Three emails sent by Mr. Roberts to Mr. Sheridan in December 2013 providing Mr. Sheridan with the file materials that Mr. Sheridan had requested.[31]  Incredibly, Plaintiffs tell this Court that on "December 10, 2013: *Without solicitation*, Defendant emailed Plaintiff Sheridan with sixteen email attachments, including the investigator's report. . . ." (emphasis added).[32]

**Category No. 2:**  Two emails exchanged in February 2014, in which Mr. Sheridan informed Mr. Roberts that the Burgess case was worth investigating under Pennsylvania law.

**February 4, 2014:**

Mr. Roberts:  "Hi Jim, I know you are busy.  Just let me know when you have concluded that there is nothing that you can do at the current time to help Mr. Burgess.  Thanks – Randy"

**February 7, 2014:**

Mr. Sheridan:  "Randy, . . . . *I would like to talk to you about this case some more and investigate it further*.  Do you have time to talk when you return from visiting Rodney? . . . . Tom" (emphasis added)

**Category No. 3**:  Several emails exchanged in March and April 2014 between Mr. Sheridan

---

[30] *See* Defendants' Ex. B at Roberts_000005; Second Amended Declaration of Randell C. Roberts at ¶¶ 40–41.

[31] *See* Defendants' Ex. B at Roberts_000005; Second Amended Declaration of Randell C. Roberts at ¶¶ 40–41.

[32] *See* Plaintiffs' Opposition at 11; Declaration of Plaintiff Thomas W. Sheridan at ¶ 21.

and Mr. Roberts' legal assistant, who was trying to set up a conference call between Mr. Roberts and Mr. Sheridan, so that Mr. Roberts could determine whether his clients would be better off under Pennsylvania law.

When placed in their proper context, these email exchanges do not support Plaintiffs' claim that Defendants "begged" or "doggedly" and "relentlessly" pursued the Plaintiffs to accept the referral.  Instead, these emails show that: (1) it was Mr. Sheridan who initially solicited the referral by first contacting Mr. Roberts by email; (2) it was Mr. Sheridan who requested the first telephone conference between these attorneys; (3) it was Mr. Sheridan who first requested the opportunity to review the case materials; (4) it was Mr. Sheridan who indicated to Mr. Roberts that the case was worth investigating further under Pennsylvania law; (5) it was Mr. Sheridan who stated that he wanted to investigate the case further; (6) Mr. Roberts turned investigation of the case over to Mr. Sheridan as Mr. Sheridan requested; (7) Mr. Sheridan delayed confirming for Mr. Roberts that the case was worth pursuing under Pennsylvania law and that Mr. Sheridan still wanted the referral; and (8) Mr. Roberts was mindful of the expiration of the statute of limitations at the end of the year. Under such circumstances, Mr. Roberts had a duty to his clients to follow up with Mr. Sheridan to determine if they had meritorious claims under Pennsylvania law.  Mr. Roberts also had a responsibility to press Mr. Sheridan for a decision about any possible referral to ensure that all of his clients' and his law firm's options were preserved in a timely manner.

**D.  Plaintiffs falsely contend that Mr. Roberts "relentlessly" requested that Mr. Sheridan co-counsel the Burgess case with Mr. Roberts in Pennsylvania, and that Mr. Sheridan "repeatedly" declined Mr. Roberts' request to co-counsel.[33]**

Mr. Sheridan states in his Declaration that in their initial conference call on December 3, 2013 (which Mr. Sheridan had requested), "I told Roberts that I was not interested in working as co-counsel

---

[33] *See* Plaintiffs' Opposition at 11, 15 and 25.

on Roberts' Pennsylvania case."[34]  If Mr. Sheridan had actually told Mr. Roberts that he was not

interested in co-counseling the case with Mr. Roberts, why would Mr. Roberts immediately begin

sending Mr. Sheridan case materials to review?[35]  Since it is undisputed that Mr. Roberts also began

consulting with other Pennsylvania lawyers, why would Mr. Roberts have anything further to do with

Mr. Sheridan under such circumstances?  If Mr. Roberts actually wanted to be involved in the

Pennsylvania litigation, why would he even need Mr. Sheridan?[36]

E.  **Plaintiffs falsely claim that Defendants unsuccessfully attempted to "extract" a "quick pre-suit settlement" from Clark Electrical Contractors, Inc.[37]**

It is undisputed that Clark Electrical Contractors, Inc.'s attorney contacted Defendants after

his client was notified of the pre-suit depositions Defendants were taking in Texas as part of the

Texas litigation.[38]  When it initially appeared that the only available third-party insurance coverage

was $2,000,000.00 through Clark Electrical Contractors, Inc., the Defendants advised Clark

Electrical Contractors, Inc.'s attorney that Defendants would be submitting the necessary

documentation of Mr. Burgess' claim along with an offer to settle his claim for that amount.[39]

Defendants, however, never extended that offer of settlement because subsequent developments in

Defendants' investigation throughout 2013 and 2014 revealed other potential avenues of recovery

and Defendants did not want to jeopardize any of those avenues of recovery for Mr. and Mrs. Burgess.

As with many of the other false allegations made by Plaintiffs, Plaintiffs do not offer any evidence

to support their allegations that Defendants, "despite their best efforts," could not obtain "[a] quick

---

[34] *See* Declaration of Plaintiff Thomas W. Sheridan at ¶ 19; *see also* Plaintiffs' Opposition at 21 ("Plaintiff Sheridan refused, on December 3, 2013, to act as co-counsel.").

[35] *See* Plaintiffs' Opposition at 11.

[36] Mr. Roberts has been admitted *pro hac vice* to serve as lead counsel for plaintiffs in personal injury cases in state and federal courts in other states, although never in Pennsylvania.  *See* Second Amended Declaration of Randell C. Roberts at ¶ 6.  *See* www.robertslawfirm.com for more information about Mr. Roberts' substantial experience with national litigation and the resources of his law firm.

[37] *See* Plaintiffs' Opposition at 1, 6, and 23 n.12.

[38] *See* Plaintiffs' Opposition at 6.

[39] *See* Plaintiffs' Ex. J (dated July 1, 2013).

9

pre-suit settlement."[40]

### F. Plaintiffs falsely claim that Defendant represented that they "would remain involved in handling the Pennsylvania lawsuit."[41]

The Texas Rules of Professional Conduct require that an attorney—*who expects to receive a referral fee*—retain "joint responsibility" for the representation of the client.[42]  As the comments to these rules explain, "joint responsibility" does not contemplate the referring attorney being involved in the handling of litigation in a foreign jurisdiction—in fact, increasing the transactional cost for the client by traveling to the foreign jurisdiction when there's no benefit to the client, is discouraged:

> Joint responsibility for the representation entails ethical and perhaps financial responsibility for the representation.  *The ethical responsibility assumed requires that a referring or associating lawyer make reasonable efforts to assure adequacy of representation and to provide adequate client communication.*  Adequacy of representation requires that the referring or associating lawyer conduct a reasonable investigation of the client's legal matter and refer the matter to a lawyer whom the referring or associating lawyer reasonably believes is competent to handle it. . . . Adequate attorney-client communication requires that a referring or associating lawyer monitor the matter throughout the representation and ensure that the client is informed of those matters that come to that lawyer's attention and that a reasonable lawyer would believe the client should be aware. . . . *Attending all depositions and hearings or requiring that copies of all pleadings and correspondence be provided a referring or associating lawyer is not necessary in order to meet the monitoring requirement proposed by this rule.  These types of activities may increase the transactional costs, which ultimately the client will bear and unless some benefit will be derived by the client, they should be avoided.*  The monitoring requirement is only that the referring lawyer be reasonably informed of the matter, respond to client questions, and assist the handling lawyer when necessary.  Any referral or association of other counsel should be made based solely on the client's best interest.[43]

Finally, Plaintiffs' representation to this Court that Defendants represented to Mr. Burgess' workers' compensation provider that "[Defendant Roberts'] office remains involved in the representation of

---

[40] *See* Plaintiffs' Opposition at 1.
[41] Plaintiffs' Opposition at 14.
[42] Tex. Disciplinary Rules Prof'l Conduct R. 1.04(f)(2)(ii).
[43] Tex. Disciplinary Rules Prof'l Conduct R. 1.04 cmt. 13.  This is an obligation imposed by Texas law and owed only to the Texas clients.
10

Mr. and Mrs. Burgess" is "demonstrably untrue" upon examination of Plaintiffs' Exhibit O.[44]

**G. Plaintiffs' representation that this referral occurred "on the eve of the expiration of the statute of limitations" is not credible or relevant to the jurisdictional facts.[45]**

As documented by both sides, Mr. Roberts provided Mr. Sheridan with the basic file materials in December of 2013—approximately one year before the expiration of the statute of limitations in December of 2014.[46] Moreover, both sides agree that the parties spent nearly a year communicating about the Burgess case before entering into a referral agreement.[47] Furthermore, both sides agree that the referral agreement was reached on September 10, 2014—three months before the expiration of the statute of limitations on December 14, 2012.

**H. Plaintiffs knowingly misconstrue Mr. Roberts' offer to refund a portion of his referral fee to help Mr. and Mrs. Burgess, and now use it to falsely contend that Mr. Roberts offered to waive his law firm's entire referral fee regardless of the outcome of the Burgess case.**

Plaintiffs repeatedly state that Defendants expressly agreed to "waive any referral fee whatsoever" in the Burgess case.[48] The truth is that Mr. Roberts offered to refund a portion of his law firm's referral fee to Mr. and Mrs. Burgess if: (1) these clients' gross financial recovery was limited to the $2,000,000.00 in insurance coverage available to Clark Electrical Contractors, Inc., and (2) the workers' compensation lien consumed the clients' portion of the recovery.[49] Mr. Roberts made this generous offer to ensure that both Mr. Sheridan and Mr. and Mrs. Burgess had an economically worthwhile case to pursue.[50] This offer was initially made in June 2014, before more promising avenues for financial recovery by Mr. and Mrs. Burgess began to appear and before the

---

[44] *Compare* Plaintiffs' Opposition at 15 *with* Plaintiffs' Ex. O.
[45] *See* Plaintiffs' Opposition at 1.
[46] *See* Second Amended Declaration of Randell C. Roberts at ¶ 41; Plaintiffs' Opposition at 11.
[47] *See* Plaintiffs' Opposition at 25.
[48] *See* Plaintiffs' Opposition at 1, 2, 13, 15, 21, 23 n.12, and 25; Declaration of Plaintiff Thomas W. Sheridan at ¶¶ 23, 28, 34, and 38.
[49] *See* Second Amended Declaration of Randell C. Roberts at ¶ 77.
[50] *See* Defendants' Ex. L at ROBERTS_000045.

actual referral agreement was entered into in September 2014.

Mr. Roberts' offer to refund a portion of his law firm's attorney fees was disclosed in Defendants' Exhibit L accompanying Defendants' original Motion ("I even offered to refund a portion of my firm's attorney fees to [Mr. and Mrs. Burgess], if the workers' compensation lien consumed their recovery and kept them from having an economically worthwhile case.").[51]  Mr. Roberts personally explained this offer to Mr. and Mrs. Burgess in the presence of his investigator.[52]

Mr. Roberts also told Mr. Sheridan about Mr. Roberts' willingness to refund a portion of his law firm's referral fee to help his clients under these limited circumstances.[53]  Mr. Roberts' efforts to help his clients any way he could apparently motivated Mr. Sheridan to mislead Mr. Roberts on February 7, 2018, into changing their referral agreement to purportedly help his clients continue to have an economically viable lawsuit.

Plaintiffs' intentional distortion of this selfless act by Mr. Roberts exemplifies Plaintiffs' distortion of the facts to this Court.  If Plaintiffs truly believe that Mr. Roberts agreed to waive his law firm's entire referral fee, regardless of the outcome of the case, how can Plaintiffs also credibly contend that "[t]he Defendants contemplated involvement in the Pennsylvania litigation after the case was referred to the Plaintiffs"?[54]  Why did the parties even bother drafting all of the documents confirming that the Defendants were to be paid forty percent (40%) of the gross attorney's fee?[55] Why were Defendants even involved in this transaction?

---

[51] Defendants' Ex. L at ROBERTS_000045.  *See* Second Amended Declaration of Randell C. Roberts at ¶ 77 for the terms of Mr. Roberts' offer to refund a portion of the referral fee to his clients.

[52] *See* Second Amended Declaration of Randell C. Roberts at ¶¶ 77.  This investigator, who recently underwent cancer surgery, has announced his plans to retire and move to Dallas, Texas to be near some of his grandchildren.  *See id.* at 78.

[53] *See* Second Amended Declaration of Randell C. Roberts at ¶ 77; Declaration of Plaintiff Thomas W. Sheridan at ¶ 36.

[54] *Compare* Plaintiffs' Opposition at 1-2 *with* Plaintiffs' Opposition at 23.

[55] *See* Defendants' Ex. D at ROBERTS_000009–000010; Defendants' Ex. E at ROBERTS_000019; Defendants' Ex. G at ROBERTS_000028–000029.

In summary, the Plaintiffs have spun a good story to deflect the Court's attention from the jurisdictional issues and the merits of their case. It is a story that is not supported by a fair interpretation of the facts.

## II. REGARDLESS OF WHETHER THERE IS JURISDICTION IN PENNSYLVANIA, THIS CASE SHOULD BE TRANSFERRED TO THE EASTERN DISTRICT OF TEXAS FOR THE CONVENIENCE OF *ALL* THE KEY WITNESSES

There are three key witnesses in this action: the two clients who were referred to Plaintiffs and Defendants' investigator. Litigation is this forum is unquestionably inconvenient[56] for all three—Mr. Burgesses is a quadriplegic, Ms. Burgess provides daily care for Mr. Burgess, and Defendants' investigator is in failing health and retiring. None of these witnesses are in the subpoena range of this Court; all three currently reside in the Eastern District of Texas and are within the subpoena range of the Eastern District of Texas. *See Dinterman v. Nationwide Mut. Ins. Co.*, 26 F. Supp. 2d 747, 750 (E.D. Pa. 1998) (finding that because the court's subpoena power did not reach important witnesses, another district was a "far more convenient and appropriate forum in which to litigate this matter"). To Defendants' knowledge, these are the only witnesses with first-hand knowledge of the terms of the disputed referral agreement and Mr. Roberts' limited offer to partially refund his referral fee to help the Burgesses.

Plaintiffs do not dispute Mr. Burgesses' inability to travel. Plaintiffs state without basis that Mrs. Burgesses' hardship in traveling is "speculative,"[57] but do not dispute that Mrs. Burgess provides daily care to Mr. Burgess, making travel to Pennsylvania inconvenient and difficult for both her and

---

[56] Plaintiffs state that their choice of forum is the "most significant factor" when weighing transfer, however, "convenience of witnesses is '[o]ften cited as the most important factor in passing on a motion to transfer under Section 1404(a) . . . and the one most frequently mentioned by the courts.'" *See Lempke v. Gen. Elec., Co.*, No. CV-10-5380, 2011 WL 3739499, at *5 (E.D. Pa. Aug. 25, 2011) (quoting 15 Charles Alan Wright et al., FEDERAL PRACTICE & PROCEDURE § 3848 (3d ed. 2007)).

[57] Plaintiffs argue that Mrs. Burgess has "already demonstrated a willingness to participate in Pennsylvania litigation by filing the underlying lawsuit in Pennsylvania." Plaintiffs' Opposition at 33. However, Mrs. Burgess is not bringing the instant action—she is a witness. The important issue is whether a forum in Pennsylvania is *convenient* for Mr. and Mrs. Burgess in *this case*.

Mr. Burgess.  Moreover, Defendants' investigator, Blane Carrifee, recently underwent cancer surgery and has announced his plans to retire and move to Dallas, Texas, to be near some of his grandchildren.[58]  Mr. Carrifee was present when Mr. Roberts contemporaneously explained to Mr. and Mrs. Burgess the terms of the referral agreement and the terms of Mr. Roberts' offer to refund a portion of his referral fee to help Mr. and Mrs. Burgess.

Plaintiffs suggest these critical witnesses could appear by trial video or deposition; however, Plaintiffs cannot dictate the manner in which Defendants present their witnesses at trial.  Defendants have the right to present their witnesses to the factfinder in person so the factfinder can make its best credibility determinations on the key facts in this action.  *See ADE Corp. v. KLA-Tencor Corp.*, 138 F. Supp. 2d 565, 569 (D. Del. 2001) (stating that "courts frequently look to the availability of witnesses as an important factor, as it can be relevant to protecting a defendant's opportunity to put on its case *with witnesses who will appear in person at the trial*." (emphasis added)).  This is particularly important with regard to the Burgesses, who are the *only independent witnesses* that can provide this Court testimony about what was actually agreed to between the attorneys.

### III. REGARDLESS OF WHETHER THERE IS JURISDICTION IN PENNSYLVANIA, THIS CASE SHOULD BE TRANSFERRED IN THE INTEREST OF JUSTICE TO AVOID HARMING THE CLIENTS

Plaintiffs dispute the relevance of the interrelated nature of the six agreements at issue in this action.  Plaintiffs argue that the Burgesses are entitled to 60% of the settlement in this case regardless of the outcome of this dispute.  This is patently false, and Plaintiffs' misguided argument places these clients, the Burgesses, at a substantial risk of harm.  Under Texas law, the Burgesses having a binding contract with *Defendants* to pay Defendants 40% of the attorney's percentage of the gross recovery in the underlying case.  *See Mandell & Wright v. Thomas*, 441 S.W.2d 841, 847 (Tex. 1969); *see also Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 561–62 (Tex. 2006).  In other words, Texas law

---

[58] *See* Second Amended Declaration of Randell C. Roberts at ¶ 78.  The residence in Dallas, Texas, to which Mr. Carrifee is intending to move is within the subpoena range of the Eastern District of Texas.

allows a law firm hired on a contingency fee basis to retain its percentage of the gross recovery, absent good cause for termination. Once a claim is settled, "the attorney has a lien on the judgment or settlement securing his services, and an attorney's lien is paramount to the rights of the parties in the suit, and is superior to other liens on the money or property involved, subsequent in point of time." *Marre v. United States*, 117 F.3d 297, 308 (5th Cir. 1997) (quoting *In re Willis*, 143 B.R. 428, 432 (Bankr. E.D. Tex. 1992)) (internal quotation marks omitted).

In two seminal Texas cases, the clients did *not* receive the full amount of their anticipated portion of a settlement because courts required the clients' attorneys to be paid their full attorney's fees. In *Mandell & Wright v. Thomas*, the Texas Supreme Court held that an attorney was entitled to collect his full contingent fee when the client terminated the contract without good cause. 441 S.W.2d at 847; *see also Reynolds v. Nagely*, 262 S.W.3d 521, 532 (Tex. App.—Dallas 2008, pet. denied) (noting the continued applicability of *Mandell*). In *Johnston v. California Real Estate Investment Trust*, a client terminated their attorney after receiving a settlement offer, then entered into a second contingent fee arrangement with another law firm. 912 F.2d 788, 788 (5th Cir. 1990). The Fifth Circuit acknowledged *Mandell* and held that the client was required to pay the contingent fees owed under both retainer agreements—resulting in the client only receiving one-third (as opposed to their anticipated two-thirds) of the total settlement. *See id.* at 789.

In short, the Burgesses have an independent contractual duty to pay Defendants their attorney's fee under their existing Contracts for Legal Services and Consents to Refer in accordance with Texas law.[59] More specifically, the Burgesses have a contractual obligation to ensure Defendants are paid 40% of the attorney's percentage of the gross recovery in the underlying personal injury suit.

---

[59] *See* Defendants' Ex. A & G.

*To be clear, Defendants have no interest in reducing the amount of the settlement that the Burgesses receive.* Defendants did not initiate this declaratory judgment action, and Plaintiffs filed this action against Defendants while Defendants were seeking to informally and privately resolve their concerns with Plaintiffs. Nevertheless, to the extent Plaintiffs now argue that transfer to the Eastern District of Texas is not appropriate, Defendants must inform the Court of the complications that arise from Plaintiffs' artificial limitation on the scope of this action—a limitation that would result in a failure to completely resolve much broader contractual issues.[60]

Even if this Court chose to decide just this sliver of a larger potential dispute, it is conceivable that Plaintiffs would still wind up re-litigating these same issues in a Texas forum. This would occur if the Burgesses were ever required to protect their anticipated portion of the settlement in a Texas forum by asserting claims for contribution, breach of fiduciary duty, or misrepresentation against Plaintiffs. Who owes who what should be decided in one forum to ensure a just and complete resolution for all concerned parties.[61]

## IV.   TEXAS HAS JURISDICTION OVER PLAINTIFFS BECAUSE IT IS UNDISPUTED THAT PLAINTIFFS CONDUCTED RELATED BUSINESS IN TEXAS

While Plaintiffs passingly dispute that Texas would have personal jurisdiction over them, they do not dispute the core jurisdictional facts that satisfy the "minimum contacts" test.[62] For example,

---

[60] In the same vein, the exercise of personal jurisdiction over Defendants in Pennsylvania would not comport with fair play and substantial justice. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–77 (1985) (noting that, in evaluating whether the exercise of personal jurisdiction comports with fair play and substantial justice, the Court may evaluate "the interstate judicial system's interest in obtaining the most efficient resolution of controversies").

[61] On a related note, when considering court congestion in the two forums under Section 1404(a)'s transfer analysis, it is notable that two additional U.S. District Judges have been appointed to the Eastern District of Texas since the filing of Defendants' Motion to Dismiss. One of those Judges, Judge J. Campbell Barker, was appointed to the Tyler Division—the Division to which the Defendants are requesting transfer of this action.

[62] Plaintiffs rely on *Jaffe v. Julien* to argue against personal jurisdiction over them in Texas. *See Plaintiffs' Opposition at 32. Jaffe* is not analogous to the instant case. In *Jaffe*, the defendant's contacts were *all* connected to the forum state—New York—including the fact that the referred clients lived in New York and that the Pennsylvania lawyer traveled to New York to negotiate the referral agreement. *See Jaffe v. Julien*, 754 F. Supp. 49, 51 (E.D. Pa. 1991).

it is undisputed that Plaintiffs physically conducted business in Texas by (1) traveling to Texas to meet with the Texas clients on at least one occasion, (2) participating in depositions in Texas, and (3) sending experts from Pennsylvania to meet with the clients in Texas.[63]  In addition, it is undisputed that Plaintiffs contracted with the Texas clients, which constitutes doing business in Texas under the Texas long-arm statute: "a nonresident does business in this state if the nonresident . . . contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state. . . ."  TEX. CIV. PRAC. & REM. CODE § 17.042(1).  In fact, it is undisputed that all six of the contracts—out of which the disputed referral fee arises—were formed in Texas.[64]

## V.   PLAINTIFFS MISLEAD THIS COURT ABOUT THE U.S. SUPREME COURT'S RECENT NARROWING OF PERSONAL JURISDICTION DOCTRINE

Plaintiffs inexplicably cast aside the U.S. Supreme Court's recent narrowing of personal jurisdiction doctrine.[65]  Numerous commentators have now observed that the U.S. Supreme Court significantly altered the personal jurisdictional landscape in a series of landmark decisions beginning in 2011:

- "Nearly 150 years after *Pennoyer*, the Supreme Court had a long list of personal jurisdiction cases, but few clear rules.  Beginning in 2011, the Court began further narrowing the scope of personal jurisdiction with opinions that reshaped its jurisprudence in this area. . . .  The United States Supreme Court has dramatically narrowed the situations in which a company can be sued in both federal and state court."  Polina Pristupa, *Too Big for Personal Jurisdiction? A Proposal to Hold Companies Accountable for in-State Conduct in Accordance with Due Process Principles*, 40 CARDOZO L. REV. 1367, 1378, 1408 (2019).

- "Since 2011, the Roberts Court has decided six personal jurisdiction cases that impose significant new constitutional restrictions on the power of courts and limit plaintiffs' access to justice. But the Court's opinions explaining those decisions have repeatedly denied that the Court is altering settled law."  Michael H. Hoffheimer, *The Stealth Revolution in Personal Jurisdiction*, 70 FLA. L. REV. 499 (2018).

---

[63] It is also undisputed that Defendants never traveled to or performed any legal services in Pennsylvania, and further undisputed that Defendants never sent anyone to Pennsylvania.  *See* Second Amended Declaration of Randell C. Roberts at ¶ 58 & 63.

[64] *See* Defendants' Exs. A, F, and G; Second Amended Declaration of Randell C. Roberts at ¶¶ 31, 42, 47, and 49.

[65] Plaintiffs' Opposition at 18 n.11.

- "After decades of avoiding personal jurisdiction cases, the Supreme Court issued four opinions addressing the law of personal jurisdiction within three years. These opinions significantly changed the shape of personal jurisdiction doctrine, leading to a rebalancing of the jurisdictional equilibrium—a balance whose center is still not fully known, as courts struggle to fit cases into the new framework set out by the Supreme Court."  Cassandra Burke Robertson & Charles W. "Rocky" Rhodes, *The Business of Personal Jurisdiction*, 67 CASE W. RES. L. REV. 775, 775–76 (2017).

- "The national impact of these decisions is playing out in real time across the country, with federal and state courts redefining the approach and often granting defendants' motions to dismiss or for mistrials and reversing jury verdicts."  Roy Alan Cohen, Diane Fleming Averell & Michelle Molinaro Burke, *So A Funny Thing Did Happen on the Way to the Forum: The Directions for Personal Jurisdiction Challenges Just Got Easier*, THE BRIEF 28 (Spring 2018).

- "Corporate personal jurisdiction, or a court's authority to assert power over a corporate defendant consistent with due process, is currently undergoing a revolution in the US Supreme Court.  In a series of decisions dating to 2011, the Court has reshaped the rules governing personal jurisdiction, making them both simpler and more predictable, and in the process significantly contracting the power of the states to hear suits against nonresident corporations." Michael Paisner, *What Do the New Rules of Personal Jurisdiction Mean for In-House Counsel?*, 35 No. 10 ASSOC. OF CORP. COUNSEL (ACC) DOCKET 58, 59 (2017).

- Another commentator, Patrick Borchers, responded to Professor Hoffheimer's article— referenced in the preceding bullet—and agreed that the U.S. Supreme Court has altered the personal jurisdictional landscape.  Professor Borchers stated: "I agree with [Professor Hoffheimer] that the dramatic shortening of long-arm jurisdiction is unjustly depriving some plaintiffs of any rational forum in which to file civil cases. . . .  I agree with [Professor Hoffheimer] that the Supreme Court is dissembling when it insists that its holdings in the six personal jurisdiction cases decided in the last seven years are unremarkable applications of existing law."  Patrick J. Borchers, *The Muddy-Booted, Disingenuous Revolution in Personal Jurisdiction*, 70 FLA. L. REV. F. 21 (2018).

- "Recently, the United States Supreme Court has made it more difficult for plaintiffs to seek redress against corporate defendants in state courts."  Julialeida Sainz, *The New Personal Jurisdiction: How the Supreme Court Is Making It Easier for Corporate Defendants to Avoid Litigation*, 5 ST. THOMAS J. COMPLEX LITIG. 1 (2018).

While the U.S. Supreme Court has denied altering settled law on personal jurisdiction, it unquestionably has restricted the exercise of personal jurisdiction.  This change in how personal jurisdiction is analyzed—which began in 2011—directly impacts how the older cases relied on by Plaintiffs should be viewed.

VI.   **THE NINTH CIRCUIT RECENTLY RECOGNIZED THAT AN ATTORNEY REFERRAL AGREEMENT IS NOT THE TYPE OF CONTRACT THAT CREATES PERSONAL JURISDICTION**

In *Joseph Saveri Law* Firm, the Ninth Circuit dismissed a substantially similar case—a case involving a typical attorney referral agreement—for lack of personal jurisdiction.  *See Joseph Saveri Law Firm, Inc. v. Criden*, 696 F. App'x 189, 192 (9th Cir. 2017).  This case was not published and is therefore not precedent, however, this case demonstrates how personal jurisdiction doctrine applies to a typical attorney referral agreement in light of the U.S. Supreme Court's narrowed personal injury doctrine.

In *Saveri*, a Florida law firm referred a case to a California law firm.  A dispute arose over the referral fee, and the California law firm filed an action in California seeking, in part, a declaration that it was not required to pay a referral fee to the Florida law firm.  *Id.* at 191.  The Court observed, in part, that (1) the Florida law firm sent an email to the California law firm to create the contract; (2) the Florida law firm sent two follow-up emails to confirm the alleged referral arrangement; and (3) the California law firm performed the legal services within California.  *Id.* at 192.  The Court dismissed the referral-fee dispute, however, because the suit failed the "purposeful availment" test, citing the U.S. Supreme Court's recent decisions, which narrowed the reach of personal jurisdiction.[66]  *See id.* (citing *Walden v. Fiore*, 571 U.S. 277, 284 (2014)).

In seeking to keep jurisdiction in California, the California firm relied on the fact that the referral agreement contemplated (and resulted in) "substantial forum-based activity," given that the litigation activities took place in California.  *See Joseph Saveri Law Firm, Inc. v. Michael Criden P.A.*, No. C-14-01740 (EDL), 2014 WL 3673313 at *1 (N.D. Cal. July 23, 2014), *rev'd and remanded sub nom. Joseph Saveri Law Firm, Inc. v. Criden*, 696 F. App'x 189 (9th Cir. 2017).   The Court

---

[66] The Court observed that phone calls, emails, and other communications do not establish personal jurisdiction in California.  *Joseph Saveri Law Firm*, 696 F. App'x at 192.  As discussed in Defendants' Motion to Dismiss and this Reply, none of the communications at issue in this action serve to establish personal jurisdiction in this action.

disagreed, noting that the *plaintiff's* litigation activities in California could not establish jurisdiction over the *defendant*.  *See Joseph Saveri Law Firm*, 696 F. App'x at 192 ("Saveri's *own* activities in California cannot establish personal jurisdiction over Criden.  Otherwise, a plaintiff could establish jurisdiction over a defendant through the plaintiff's own contractual performance within a forum state." (citing *Walden*, 571 U.S. at 284) (emphasis in original)).  Similarly, the instant action fails the purposeful-availment test, particularly in light of recent U.S. Supreme Court precedent, and this action should be dismissed.

**VII.  PLAINTIFFS RELY UPON CASES THAT PRE-DATE THE U.S. SUPREME COURT'S RESTRICTING OF PERSONAL JURISDICTION AND THAT ARE NOT ANALOGOUS TO THIS CASE**

Plaintiffs primarily rely on three court decisions to support their view of personal jurisdiction.  Aside from the fact that these decisions were issued prior to the U.S. Supreme Court's narrowing of personal jurisdiction doctrine, these cases are simply not analogous to the instant action.

First, Plaintiffs' most analogous case, *English & Smith v. Metzger*, involves a *co-counsel* agreement—the exact opposite of the typical referral arrangement in the instant case.  *See English & Smith v. Metzger*, 901 F.2d 36, 37 (4th Cir. 1990).  Rather, the attorneys in *English* jointly prosecuted the case and shared in the privileges and responsibilities of representing the client—in other words, the first attorney *continued* working on the case after associating with the second attorney.  *See id.* at 40.  Though Defendants dispute Plaintiffs' factual contentions, Plaintiffs concede that the instant dispute does *not* involve a co-counsel arrangement.[67]  In fact, assuming Plaintiffs' allegations were even true, Plaintiffs allege that they rejected the opportunity to become co-counsel with Defendants, thereby declining the privileges and benefits that come with that arrangement—including the potential opportunity to exercise personal jurisdiction over Defendants in Pennsylvania.

---

[67] As noted in the Second Amended Declaration of Randell C. Roberts at 14 n.4, most of the companies that were named as defendants in the underlying lawsuit appear to be incorporated outside of Pennsylvania.

Second, the *Remick*[68] and *English* decisions were decided, in part, on the basis that the *defendant* solicited the *plaintiff* for business. *See Remick v. Manfredy*, 238 F.3d 248 (3d Cir. 2001); *English & Smith*, 901 F.2d at 39. As described in the attached Second Amended Declaration of Randell C. Roberts, Defendants did not initiate the referral to Plaintiffs in the instant action—and Defendants' position is clearly supported by the emails cited earlier. Rather, it was Plaintiffs who initiated the referral relationship, making the *Remick* and *English* decisions supportive of *Defendants'* position on personal jurisdiction in this action.[69]

Third, *Remick* and *English* were also decided, in part, on the basis that the plaintiff performed its contractual duties within the forum. *See Remick*, 238 F.3d at 256; *English*, 901 F.2d at 39. As observed by the Ninth Circuit in *Saveri*, the U.S. Supreme Court's more restrictive view of personal jurisdiction focuses only on a *defendant's* activities and no longer considers a *plaintiff's* performance of contractual duties within the forum. *See Joseph Saveri Law Firm*, 696 F. App'x at 192 (citing *Walden*, 571 U.S. at 284)).

Fourth, Plaintiffs are incorrect that the communications between Plaintiffs and Defendants established minimum contacts in Pennsylvania. *See, e.g.*, Plaintiffs' Opposition at 26 (citing *Grand Entm't Grp. v. Star Media Sales*, 988 F.2d 476 (3d Cir. 1993)). As to *pre-referral* communications between Plaintiffs and Defendants, the Third Circuit has held that "an exchange of communications between a resident and a nonresident in developing a contract is insufficient of itself to be characterized as purposeful activity invoking the benefits and protection of the forum state's laws." *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Products Co.*, 75 F.3d 147, 152 (3d Cir. 1996)

---

[68] Importantly, the *Remick* decision involved an attorney-client fee agreement, not an attorney referral agreement.

[69] Plaintiffs disingenuously imply that Mr. Sheridan travels to other states at his expense to give presentations to attorneys without "any interest in marketing his law practice." *See* Plaintiffs' Opposition at 8. Interestingly, the Declaration of Plaintiff Thomas W. Sheridan does not actually support that representation to this Court. In fact, it is common knowledge that plaintiff's personal injury attorneys speak at conferences and seminars to solicit potential referrals from other attorneys.

(quoting *Stuart v. Spademan*, 772 F.2d 1185, 1193 (5th Cir. 1985)).  That is, discussions between Plaintiffs and Defendants about the facts of the underlying oilfield accident case and potential structure of the referral relationship are insufficient to confer personal jurisdiction over Defendants.

Similarly, the communications between Plaintiffs and Defendants *after* entering into the referral arrangement do not constitute sufficient minimum contacts to create personal jurisdiction over Defendants in this action.  The post-referral communications between Plaintiffs and Defendants were in furtherance of Defendants' duty to the clients to monitor Plaintiffs' activities relating to the underlying personal injury claim.[70]  Importantly, "normal incidents of legal representation, such as making phone calls and sending letters, do not, by themselves, establish purposeful availment to support the assertion of personal jurisdiction."  *Asanov v. Gholson, Hicks & Nichols, P.A.*, 209 F. App'x 139, 142 (3d Cir. 2006) (quoting *Sher v. Johnson*, 911 F.2d 1357, 1363 (9th Cir. 1990)) (internal quotation marks omitted).

## VIII.   ASSUMING PLAINTIFFS FACTUAL MISREPRESENTATIONS ARE TRUE, THERE STILL IS NO PERSONAL JURISDICTION OVER DEFENDANTS IN PENNSYLVANIA

### A.   Defendants' activities in Texas did not create jurisdiction in Pennsylvania.

Plaintiffs incorrectly focus their jurisdictional arguments[71] on activities in Pennsylvania in the underlying personal injury claim.  However, as Plaintiffs note, "This declaratory judgment action regards *the terms of a referral fee agreement between the Plaintiffs and the Defendants*."[72]  Activities in the underlying claim are irrelevant to the personal jurisdiction analysis in this declaratory judgment action.  *See Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cnty.*, 137 S. Ct. 1773, 1781 (2017) (stating that personal jurisdiction requires "a connection between the forum and *the specific claims at issue*" (emphasis added)); *see also Aetna, Inc. v. Whatley Kallas*, No. CV-18-

---

[70] *See supra* Section I(F).
[71] Contrary to Plaintiffs' sweeping assertion, Defendants are challenging the "arise out of or relate to" prong of personal jurisdiction analysis, as evidenced by Defendants' Motion and this Reply.
[72] Plaintiffs' Opposition at 29 (emphasis added).

2172, 2019 WL 1437916, at *6 (E.D. Pa. Mar. 29, 2019) (looking only to "the *relevant contacts*, i.e., [defendants'] conduct relating to the *settlement* of the . . . lawsuits and the implementation of that *settlement*" (emphasis added)).  In short, Plaintiffs improperly conflate a jurisdictional analysis in the underlying personal injury claim with a jurisdictional analysis in this declaratory judgment action.

### B. Similarly, any alleged 'settlement discussions' did not create personal jurisdiction.

Plaintiffs use Defendants' brief discussion about settlement[73] with counsel for one of the defendants in the underlying personal injury claim as a basis for personal jurisdiction.  In a decision cited favorably by the U.S. District Court for the Eastern District of Pennsylvania, however, the Federal Circuit observed that treating offers of settlement as jurisdictional facts would "be contrary to fair play and substantial justice by providing disincentives for the initiation of settlement negotiations."  *Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1361 (Fed. Cir. 1998) (noting that "this policy [favoring settlement] squarely invokes one of the considerations enumerated by the Supreme Court for the second prong of a proper Due Process analysis, namely, the interstate judicial system's interest in obtaining the most efficient resolution of controversies." (internal quotation marks and citations omitted)); *Radio Music License Comm., Inc. v. Glob. Music Rights, LLC*, No. CV-16-6076, 2017 WL 8682117, at *17 (E.D. Pa. Nov. 29, 2017), *report and recommendation adopted*, No. CV-16-6076, 2019 WL 1437981 (E.D. Pa. Mar. 29, 2019) (distinguishing "an offer for settlement of a disputed claim" from "an arms-length negotiation in anticipation of a long-term continuing business relationship").  The Eight Circuit Court of Appeals has also observed that "courts have hesitated to use unsuccessful settlement discussions as 'contacts' for jurisdictional purposes."  *Digi–Tel Holdings, Inc. v. Proteq Telecomms (PTE), Ltd.*, 89 F.3d 519, 524 (8th Cir. 1996).  To that end, Defendants' efforts determine whether settlement was appropriate

---

[73] *See* Defendants' Ex. J.

do not create personal jurisdiction over Defendants in Pennsylvania in the instant action.[74]

## IX.   CONCLUSION

There is no personal jurisdiction over Defendants in Pennsylvania and accordingly, the Court should dismiss this action unless it finds it in the interest of justice to transfer the case to the U.S. District Court for the Eastern District of Texas pursuant to 28 U.S.C. § 1631.  To the extent the Court determines that it has personal jurisdiction over one or both Defendants, the Court should transfer this action to the U.S. District Court for the Eastern District of Texas pursuant to 28 U.S.C. § 1404(a).[75]

Respectfully submitted:

**HAINES & ASSOCIATES**

_____ */s/ Clifford E. Haines*
CLIFFORD E. HAINES
DANIELLE M. WEISS
The Widener Building, 5th Floor
1339 Chestnut Street
Philadelphia, PA 19107
(215) 246-2200 (Telephone)
(215) 246-2211 (Facsimile)

***Attorneys for Defendants***

Dated: May 28, 2019

---

[74] An analysis of whether Defendants' investigation from Texas of the underlying accident creates jurisdiction was provided in Defendants' Memorandum of Law at 14-15.

[75] Defendants maintain that the overwhelming evidence set forth in their Motion warrants transfer of this action to the Eastern District of Texas.  If the Court grants transfer, then additional jurisdictional discovery is not necessary, and this action can proceed to the merits for the sake of the clients, witnesses, and all concerned parties.  If the Court is not completely persuaded that this action should be transferred to the Eastern District of Texas, Defendants alternatively request that the Court authorize jurisdictional discovery so Defendants can further establish Plaintiffs' contacts with Texas.  If jurisdictional discovery is granted, Defendants request that the Court withhold ruling on their Motion to Transfer until jurisdictional discovery is complete and Defendants have had the opportunity to submit supplemental briefing in light of that discovery.

IN TH UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHERIDAN AND MURRAY, LLC and
THOMAS W. SHERIDAN,

                    Plaintiffs,

        v.                                    Civil Action No. 19-467 (RBS)

ROBERTS AND ROBERTS, and
RANDELL C. ROBERTS,

                    Defendants.

**CERTIFICATE OF SERVICE**

I, Clifford E. Haines, Esquire, hereby certify that I have caused this document to be filed electronically on this 28th day of May, 2019.  It is available for reviewing and downloading from the ECF System.

_____*/s/ Clifford E. Haines*_____
CLIFFORD E. HAINES
The Widener Building, 5th Floor
1339 Chestnut Street
Philadelphia, PA 19107
(215) 246-2200 (Telephone)
(215) 246-2211 (Facsimile)