**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHERIDAN AND MURRAY, LLC and | : | |
| THOMAS W. SHERIDAN, | : | Civ. A. No. 19-467 (RBS) |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ROBERTS AND ROBERTS, and | : | |
| RANDELL C. ROBERTS, | : | |
| | : | |
| Defendants. | : | |

**SECOND AMENDED DECLARATION OF RANDELL C. ROBERTS
IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION OR, IN THE ALTERNATIVE,
MOTION TO TRANSFER VENUE TO THE EASTERN DISTRICT OF TEXAS**

I, Randell C. Roberts, hereby submit this Second Amended Declaration, pursuant to 28 U.S.C. §1746, and in support of Defendants' Motion to Dismiss for Lack of Personal Jurisdiction Or, In the Alternative, Motion to Transfer Venue to the Eastern District of Texas, and declare as follows:

1.      I am one of the defendants in this civil action.

2.      I am also a citizen of Texas and I reside in Tyler, Texas, which is within the area where the United States District Court for the Eastern District of Texas sits.

3.      I have been an attorney licensed to practice law in Texas since 1979.  I am also certified in Personal Injury Trial Law by the Texas Board of Legal Specialization.  I am also admitted to practice law before the United States District Court for the Eastern District of Texas, the United States Fifth Circuit Court of Appeals, and the United States Supreme Court.

4.      I have practiced personal injury law for nearly 40 years.  During my professional career, I have been recognized in *Time*, *Newsweek*, *Ladies Home Journal*, and *The Texas Lawyer* as well as on CNN and NBC's "Dateline" for my role in uncovering the documents that led to the recall of the Firestone Radial ATX and Wilderness lines of tires. My case against Firestone was featured in McGraw-Hill's college textbook on corporate crime entitled *Criminology and the Criminal Justice System*. Because of my role in other noteworthy personal injury cases, I have more recently been invited to appear on "Fox & Friends," ABC's "Good Morning America," CNN's "American Morning," MSNBC, Fox Business News, "Geraldo at Large," and CNBC.  I have also been consulted on legal issues by *The Wall Street Journal*, *USA Today*, *Business Week*, *Bloomberg News*, and *The Associated Press*.

5.      I have also been a frequent lecturer at advanced personal injury seminars. I have spoken at the "Stalwarts' Hall of Fame" at the annual convention of the American Association for Justice as well as at their annual "Weekend With the Stars" program.  I have written numerous papers and spoken on such topics as products liability and investigating major personal injury claims. I was one of only 16 trial attorneys in the nation to have earned the "Advanced Studies in Trial Advocacy" award from the National College of Advocacy.

6.      I have been admitted *pro hac vice* to serve as lead counsel for plaintiffs in personal injury cases in state and federal courts in other states, but never in Pennsylvania.

7.      I am also the founding shareholder and Managing Attorney of The Roberts Law Firm, A Professional Corporation d/b/a Roberts & Roberts, A Professional Corporation.

2

8.      Roberts  & Roberts, A Professional Corporation is a Texas professional corporation that was incorporated under Texas law in 1982.

9.      The principal place of business of Roberts & Roberts is located at 118 West Fourth Street, Tyler, Texas 75701.  This location is within the area where the United States District Court for the Eastern District of Texas sits.

10.      Roberts & Roberts has two satellite offices located in Dallas and Longview, Texas. These satellite offices are within approximately 100 miles of our principal office in Tyler.  Roberts & Roberts has no other offices in Texas or elsewhere.

11.      I make this Declaration on behalf of myself and on behalf of Roberts & Roberts ("my law firm").

12.      Neither I nor any attorney employed by my law firm is licensed to practice law in Pennsylvania.

13.      Neither I nor any attorney employed by my law firm has ever appeared before a Pennsylvania court in a *pro hac vice* role or otherwise.

14.      Neither I nor any attorney employed by my law firm has ever participated in any legal proceedings in Pennsylvania, including depositions.

15.      Neither I nor any attorney employed by my law firm has ever performed any legal services in Pennsylvania.

16.      Neither I nor any attorney employed by my law firm has ever represented a Pennsylvania resident.

17.     My law firm has never been incorporated in Pennsylvania, registered to do business in Pennsylvania, or licensed to practice law in Pennsylvania.

18.     Neither I nor my law firm have ever owned, leased, or used land or real property in Pennsylvania.

19.     Neither I nor my law firm have ever submitted a tax return to or paid any property or income taxes to the Commonwealth of Pennsylvania or any city or county located in the Commonwealth of Pennsylvania.

20.     My law firm has never submitted any administrative reports to any agency or department of the Commonwealth of Pennsylvania.

21.     Neither I nor my law firm have any agents, employees, or representatives located in Pennsylvania, including any agent for service of process in Pennsylvania.

22.     Neither I nor my law firm have ever had any bank accounts in Pennsylvania.

23.     Neither I nor my law firm have ever had a telephone listing or address in Pennsylvania.

24.     Neither I nor my law firm have ever advertised or solicited business of any type in Pennsylvania.

25.     Neither I nor my law firm have ever conducted business of any type in Pennsylvania.

26.     Neither I nor my law firm regularly purchase products or supplies within Pennsylvania for use in our business.

4

27.     James and Kay Burgess are citizens and residents of Texas.   Their permanent residence is in Mabank, Texas, which is in the county adjoining the county in which my law firm's principal office is located.   Their permanent residence is also within the area where the United States District Court for the Eastern District of Texas sits.

28.     James Burgess was severely injured while working for Patterson-UTI Drilling Company LLC on December 14, 2012.   Patterson-UTI Drilling Company LLC is a Texas Limited Liability Company.   Patterson-UTI Drilling Company LLC has offices within the area where the United States District Court for the Eastern District of Texas sits.

29.     James Burgess was injured on a drilling rig in Pennsylvania when a light fixture fell on his head.   He was injured while working with a drilling crew employed by Patterson-UTI Drilling Company LLC.   The rig manager and a number of the drilling crew, who were witnesses to this occurrence, reside in Texas.

30.     As a result of this accident, James Burgess was rendered a quadriplegic.   He remains hospitalized in a facility in Tyler, Texas.   This facility, which is where James Burgess stays and Kay Burgess spends her days, is within the area where the United States District Court for the Eastern District of Texas sits.

31.     In early spring of 2013, James and Kay Burgess each retained my as well as my law firm's services to represent them in their personal injury claims resulting from this accident. My law firm's contracts with each of them (Exhibit A) were accepted and fully executed in Texas. Neither of these contracts have ever been terminated or disavowed by any party to those contracts. My law firm's employment contracts with James and Kay Burgess were drafted in accordance

with the Texas Disciplinary Rules of Professional Conduct, the Texas Government Code, and Texas law.  I expected these employment contracts to be governed by Texas law.

32.     James Burgess's employer, Patterson-UTI Drilling Company LLC, refused to cooperate with my law firm's investigation into this accident.  In the spring of 2013, I filed a lawsuit against the employer in Van Zandt County, Texas, to compel the discovery of information about how and why this accident occurred.  This was the only lawsuit that either I or my law firm ever filed on behalf of James and Kay Burgess and it was styled *No. CV04893; James Burgess v. Patterson-UTI Drilling Company LLC; County Court at Law; Van Zandt County, Texas*.  During 2013, my law firm or I obtained a court order compelling Patterson-UTI Drilling Company LLC to produce relevant documents, deposed its corporate representative, interviewed witnesses, and reviewed relevant documents.  These legal proceedings all occurred within the area where the United States District Court for the Eastern District of Texas sits.

33.     James Burgess's employer, Patterson-UTI Drilling Company LLC, is a Texas limited liability company.  In connection with the lawsuit I filed against this employer in Texas, I employed multiple investigators, one of whom was in Pennsylvania, to interview witnesses.  I also wrote to various federal and state agencies, including Pennsylvania agencies, requesting relevant records.  This investigation was in furtherance of the claims my law firm was investigating in the lawsuit we had filed against the employer in Texas.  Neither I nor my law firm ever hired anyone to travel from Texas to Pennsylvania to conduct any aspect of our investigation.

34.     When I filed the lawsuit against the employer in Texas, the medical prognosis for James Burgess was poor.  Had James Burgess not survived his catastrophic injury, his heirs would have been able to proceed with a claim for punitive damages against the employer.  By October of

2013, however, the medical prognosis for James Burgess had improved and I dismissed the lawsuit against the employer.  I dismissed this lawsuit because James Burgess was covered by workers' compensation insurance at the time of this accident, and Texas law prohibits him or his heirs from seeking monetary damages from his employer in such circumstances.

35.     My investigation indicated that at least Clark Electrical Contractors, Inc., which installed the light fixture on the drilling rig, might have some liability for James and Kay Burgess's damages.  Clark Electrical Contractors, Inc. appeared to only have $2,000,000.00 in liability insurance coverage, however, and the workers' compensation lien on any settlement would exceed $2,000,000.00.  The workers' compensation carrier also advised me that it would not consider reducing its lien so that James and Kay Burgess could share in any settlement obtained from a third party, including Clark Electrical Contractors, Inc.

36.     In October of 2013, I attended an American Association for Justice seminar in Napa, California, entitled "2013 Refocus Seminar with Rodney Jew:  It's All About the Optics." In an apparent effort to market his law practice to attorneys around the country attending that seminar, Thomas W. Sheridan of Sheridan and Murray, LLC gave a presentation at that seminar. It was at this seminar in Napa, California, that I first met Mr. Sheridan who is a plaintiff in this civil action filed against me.  I never met Mr. Sheridan in person again after that seminar.

37.     After his presentation, Mr. Sheridan invited questions from the audience.  I was one of the attendees who did ask Mr. Sheridan as well as the other speakers about aspects of their presentations.  Since Mr. Sheridan was from Pennsylvania, I asked him during our conversation if he was aware of any way under Pennsylvania law I could get the workers' compensation insurance carrier to allow James Burgess to receive a portion of a settlement that would be smaller than the

workers' compensation lien.  Mr. Sheridan asked me a number of questions about James Burgess's accident that were beyond the scope of my question to him.  Mr. Sheridan then informed me that there might be causes of action for James Burgess against third parties under Pennsylvania law that might not be available to James Burgess under Texas law.  Mr. Sheridan also informed me that Pennsylvania law might provide more leverage for getting a lien reduction from the workers' compensation insurance carrier than Texas law.

38.    My conversation with Mr. Sheridan lasted less than ten minutes.  At the conclusion of our conversation, he made a note of my name and invited me to contact him if I needed any help with James Burgess's case.

39.    When I left the seminar in Napa, California, I had no further plans to contact Mr. Sheridan.

40.    I had no further contact with Mr. Sheridan until approximately six weeks later on November 15, 2013.  On November 15, 2013. I received an unsolicited email (Exhibit B) at my office in Tyler, Texas, from Mr. Sheridan.  His email invited me to call him to discuss James Burgess's case with him further or to email him any further information that I might like for him to review to identify other avenues of recovery for James Burgess.

41.    In December of 2013, I accepted Mr. Sheridan's invitation to provide him with more information about James Burgess's accident.  These file materials were forwarded to Mr. Sheridan at his request and more than one year before the expiration of the statute of limitations on December 14, 2014.  After reviewing the information he had requested from me, Mr. Sheridan sent me an email on February 7, 2014 (Exhibit C) stating that he would like to investigate the case further.

42.     On September 10, 2014, Mr. Sheridan and I spoke by telephone.  I was in my office in Tyler, Texas.  In that conference, Mr. Sheridan offered to divide between our firms the attorney's fee earned in the representation of James and Kay Burgess, if these clients and I agreed to his undertaking their representation.  Mr. Sheridan specifically offered in that conversation to pay my law firm 40% of the gross attorney fees earned in the representation of James and Kay Burgess.  It was my understanding that Mr. Sheridan was offering to pay a 40% referral fee because my law firm had performed more than the customary amount of work necessary to earn the customary one-third (1/3) referral fee.  I accepted Mr. Sheridan's offer in that telephone conference in my office on September 10, 2014.  We concluded that telephone conference with the understanding that I would refer James and Kay Burgess's claims to his law firm for further prosecution with their consent.

43.     The next day, September 11, 2014, Mr. Sheridan sent an email (Exhibit D) to me at my office in Tyler, Texas stating:  "I have attached a letter to you acknowledging your referral of these matters to me and my firm and our commitment to pay you a 40% referral fee."  Attached to that email was a letter (Exhibit E) from Mr. Sheridan, which was addressed to me at my office in Tyler, Texas, and also dated September 11, 2014, which stated: "This letter will also confirm that our firm will pay you a referral fee in the amount of forty percent (40%) of the gross attorney's fee recovered by Sheridan & Murray for its representation of both Mr. & Mrs. Burgess."

44.     Contrary to the express representations of Plaintiffs Sheridan and Murray, LLC and Thomas W. Sheridan to the Court,[1] there was no oral agreement made on September 10, 2014, that my law firm would only be paid "a referral fee in the amount of forty percent (40%) of any fee

---

[1] *See* Paragraph No. 14 of Plaintiffs' Complaint for Declaratory Relief [Docket No. 1].

that Sheridan and Murray realized from any recoveries made against Clark Electric."  Moreover, there was no agreement that this "referral fee specifically excluded any fees Sheridan and Murray realized from recoveries made against defendants other than Clark Electric."  Furthermore, Mr. Sheridan's referral confirmation letter of September 11, 2014, did not "mistakenly and incorrectly"[2] state that my law firm was entitled to forty percent (40%) of all the gross attorney's fee recovered by Sheridan and Murray.  Instead, Mr. Sheridan's email forwarding his letter of September 11, 2014, and that letter affirmed his commitment to pay a 40% referral fee (Exhibits D & E).

45.   Contrary to the express representations of Plaintiffs Sheridan and Murray, LLC and Thomas W. Sheridan to the Court that Mr. Sheridan's letter of September 11, 2014, was never signed by Mr. Sheridan,[3] it was electronically signed by Mr. Sheridan (Exhibit E).  More importantly, this letter was attached to an email Mr. Sheridan sent to me on September 11, 2014, (Exhibit D) in which Mr. Sheridan personally wrote:  "I have attached a letter to you acknowledging the referral of these matters to me and my firm and our commitment to pay you a 40% referral fee."

46.   Also attached to Mr. Sheridan's email of September 11, 2014, were employment contracts (Exhibit F), which Mr. Sheridan instructed me to have James and Kay Burgess execute in Texas and return to Mr. Sheridan.  These contracts were drafted by Mr. Sheridan's law firm, Sheridan and Murray LLC, and they each identified James and Kay Burgess as having an address of "160 VZ CR 2724, Mabank, Texas 75147."  This address is within the area where the United States District Court for the Eastern District of Texas sits.

---

[2] *See* Paragraph No. 15 of Plaintiffs' Complaint for Declaratory Relief [Docket No. 1].
[3] *See* Paragraph No. 16 of Plaintiffs' Complaint for Declaratory Relief [Docket No. 1].

47.     In accordance with Mr. Sheridan's instructions, I explained Mr. Sheridan's contracts to James and Kay Burgess.  These contracts, which did not require a signature from Mr. Sheridan, were accepted and fully executed by James and Kay Burgess (Exhibit F) in the Eastern District of Texas.

48.     Before James and Kay Burgess accepted and fully executed Mr. Sheridan's employment contracts, I explained to them the terms of the referral agreement between me and Mr. Sheridan, including the division of the attorney's fee.  An investigator, Blane Carrifee, was present when I explained the terms of the referral agreement to James and Kay Burgess.  These witnesses to the terms of the original referral agreement, James Burgess, Kay Burgess, and Blane Carrifee, all reside within the Eastern District of Texas.

49.     After I explained the terms of the referral agreement to James and Kay Burgess, they each executed a Consent to Refer (Exhibit G).  These documents confirmed their understanding of the referral agreement, their consent to the referral agreement, and their agreement that my law firm would receive 40% of the total attorney's fee and that Sheridan & Murray would receive 60% of the total attorney's fee.  Like my law firm's original two employment contracts with James and Kay Burgess and Mr. Sheridan's two employment contracts with James and Kay Burgess, these two Consents to Refer were accepted and fully executed in the Eastern District of Texas.  These Consents to Refer have never been terminated or disavowed by any party to them.

50.     James and Kay Burgess's Consents to Refer, each of which affirmed my law firm's right to 40% of the total attorney's fee, were sent to Mr. Sheridan along with his executed employment contracts in September of 2014.  Until the Plaintiffs' Complaint for Declaratory

11

Relief was filed against me in 2019, Mr. Sheridan never suggested that these Consents to Refer did not accurately reflect our original referral agreement after he received them.

51.     The Consents to Refer that I provided to Mr. Sheridan for each client, and which provided for my law firm to receive 40% of the total attorney's fee, is a document which I am required under the Texas Disciplinary Rules of Professional Conduct to have my clients execute before referring them to another attorney.  I expected these Consents to Refer to be governed by the Texas Disciplinary Rules of Professional Conduct and Texas law.

52.     The referral agreement that Mr. Sheridan and I entered into on September 10, 2014, did not include a choice of law or forum selection provision and Mr. Sheridan did not raise either of those issues with me during our negotiations.  I expected the six written contracts or agreements (Exhibits A, F, and G), which addressed the attorney's fee and their division between the law firms and the clients, would be governed by Texas law and that any legal dispute over their interpretation or enforceability would be decided in a Texas forum.

53.     In referring James and Kay Burgess to Mr. Sheridan, I made the choice not to appear *pro hac vice* and file their lawsuit in a federal or state court in Pennsylvania.  I made that decision because I was heavily involved at that time in some toxic tort litigation in the Eastern District of Texas and I did not want to undertake the responsibility of familiarizing myself with Pennsylvania law or performing all of the other requirements for properly providing legal services in Pennsylvania.

54.     When I referred James and Kay Burgess to Mr. Sheridan, I anticipated that Mr. Sheridan would probably file their lawsuit against a number of potential defendants including Clark Electrical Contractors, Inc.  I did not, however, know the identity of most of these defendants

or the legal theories of liability under Pennsylvania law that Mr. Sheridan might allege against them.

55.     Mr. Sheridan eventually filed a lawsuit on behalf of James and Kay Burgess.  Mr. Sheridan did not consult with me as to where the lawsuit would be filed[4] or who would be named as defendants in the lawsuit.  Only recently have I learned that Mr. Sheridan actually filed two lawsuits on behalf of James and Kay Burgess,[5] although I do not understand why the second lawsuit was filed.  Other than identifying Clark Electrical Contractors, Inc. as a potential defendant, I did not offer any advice or attempt to exercise any control over who should be named as a defendant in the lawsuit or where the lawsuit should be filed.

56.  Neither I, my law firm, nor any attorney employed by my law firm was ever listed as counsel for James and Kay Burgess in either lawsuit that Mr. Sheridan and his law firm filed on behalf of James and Kay Burgess in Pennsylvania.

57.     Neither I nor any attorney employed by my law firm ever appeared before any court or participated in any legal proceedings in either lawsuit that Mr. Sheridan and his law firm filed on behalf of James and Kay Burgess.

58.     Neither I nor any member of my law firm ever traveled to or performed any legal services in Pennsylvania in furtherance of either lawsuit that Mr. Sheridan and his law firm filed on behalf of James and Kay Burgess.

---

[4] Most of the companies that were named in the lawsuit appear to be incorporated outside of Pennsylvania.
[5] *See No. 1412-01813; James Burgess, et al. v. Clark Electrical Contractors, Inc., et al*., Court of Common Pleas, Philadelphia County, PA; and *No. 1412-01798*; *James Burgess, et al. v. Patterson-UTI, et al*., Court of Common Pleas, Philadelphia County, PA.

59.     On the afternoon of February 7, 2018, Mr. Sheridan called me at my office in Tyler, Texas.  I had just returned to my office that afternoon, after being out of town on business for two days.  I was catching up on work when we spoke that afternoon.  Mr. Sheridan gave me a brief and pessimistic status report on the lawsuit he had filed.  He then told me the lawsuit would require a great deal of more time and expense if it was to go forward.  He told me that the attorneys that he was working with had requested that he call me to ask if I would reduce my 40% referral fee so that James and Kay Burgess would continue to have an economically viable lawsuit for them to pursue.  He asked me if I would agree to cap my law firm's fee at 40% of the attorney's fee recovered against Clark Electrical Contractors, Inc.  I agreed to Mr. Sheridan's request, and I told him that I would be happy to do anything else that I could to help James and Kay Burgess get a settlement in their case.  This telephone conference on February 7, 2018, lasted less than ten minutes.

60.     There was no discussion in that telephone conference on February 7, 2018, about the accuracy of the referral agreement described in Mr. Sheridan's letter to me of September 11, 2014, (Exhibit D) and in his email of that same day (Exhibit E).  If Mr. Sheridan had suggested in that telephone conference that his letter and email of September 11, 2014 did not accurately reflect our referral agreement, I would have strongly objected and contradicted him.  If Mr. Sheridan had suggested in that telephone conference that I had originally agreed that my law firm would only receive 40% of the attorney fees recovered from only one of many defendants, I would have strongly objected and contradicted him.  More importantly, I would not have agreed to change our referral agreement based on any suggestion that there was a misunderstanding as to our original referral agreement.  I only agreed to change our referral agreement because Mr. Sheridan represented to me that a change was necessary for James and Kay Burgess to continue to have an

economically viable lawsuit.  I would not have agreed to change our referral agreement because Mr. Sheridan now thought that this change would be a more appropriate division between our law firms of the attorney's fee.

61.     Several hours after my telephone conference with Mr. Sheridan on February 7, 2018, I received a lengthy email from Mr. Sheridan (Exhibit H) that essentially asked me to confirm that my law firm's referral fee would now be capped at 40% of the attorney's fee recovered from Clark Electrical Contractors, Inc. for a maximum referral fee of $320,000.00.  I was working late that night, but I took time to briefly read Mr. Sheridan's email.  I did not agree with all of the statements made by Mr. Sheridan in that email or understand why they were included. Nonetheless, the email correctly stated that I had agreed to a maximum referral fee of $320,000.00, so I confirmed the email for Mr. Sheridan at 8:40 p.m. that night and wished him "good luck" in helping James and Kay Burgess.

62.     Approximately eight months later, in October of 2018, Mr. Sheridan and his law firm reportedly settled James and Kay Burgess's claims for $44,000,000.00.[6]

63.     I have since learned that Mr. Sheridan personally came to Texas and engaged in a course of conduct in Texas that kept me as uninformed as possible about the lawsuit he had filed for James and Kay Burgess.  For example, Mr. Sheridan came to Tyler, Texas, and met with James and Kay Burgess at the hospital a few blocks from my office without ever informing me.  Mr.

---

[6] See Paragraph No. 22 of Plaintiffs' Complaint for Declaratory Relief confirming that a global settlement was reached in October of 2018 and the attached page from the Sheridan & Murray website announcing that "[a] $44,000,000 settlement was successfully negotiated with five (5) companies on behalf of our clients, James and Kay Sharon Burgess" (Exhibit I).  Since the original Declaration of Randell C. Roberts was filed on April 15, 2019, Plaintiffs have amended their Complaint to change their account of when the global settlement was reached.  They now contend that they "reached a global settlement in November of 2018" in an apparent effort to explain why they did not disclose the settlement to me when I inquired about it on November 14, 2018 (Exhibit J).  See Paragraph No. 29 of Plaintiffs' First Amended Complaint for Declaratory Relief.

Sheridan also had some of his retained expert witnesses in Pennsylvania travel to Tyler, Texas, to meet with James and Kay Burgess at that hospital without ever informing me. Based upon information and belief, he or members of his law firm also participated in depositions in Texas in the lawsuit filed on behalf of James and Kay Burgess. I only learned of Mr. Sheridan's activities in Texas after the lawsuit was settled.

64.     Contrary to the implied representations of Sheridan and Murray, LLC and Thomas W. Sheridan to the Court,[7] Mr. Sheridan did not call and inform me of the settlement. As reflected in the attached emails (Exhibit J), Mr. Sheridan sent me an email on November 14, 2018, which asked what my costs were in the Burgess case so he could "protect them." I emailed him back that day and asked, "Have you settled?" Mr. Sheridan responded by email stating "Not yet." Moreover, Mr. Sheridan did not call and inform me of the settlement after he had reported it in the media on November 27, 2018 (Exhibit K). I learned about the settlement on December 18, 2018, when Mr. Sheridan called me to ask me some questions about a second personal injury client that I had recently referred to him.[8]   At the conclusion of that telephone conference about another client, I asked Mr. Sheridan how the lawsuit that he had filed on behalf of James and Kay Burgess was going and if he had made any progress in getting it settled. He told me that he had gotten the case settled and that he was now working on the workers' compensation insurance lien, but he did not volunteer the amount of the settlement. I then asked him if James and Kay Burgess were going to come out alright in the settlement, and he assured me that they would be well taken care of by the settlement. He once again declined to volunteer the amount of the settlement to me. I then

---

[7] *See* Paragraph No. 23 of Plaintiffs' Complaint for Declaratory Relief [Docket No. 1].
[8] This second personal injury client is a Texas resident who had a potential products liability claim against a manufacturer based in Pennsylvania. I referred this client to Mr. Sheridan in November of 2018. This client is the only other client I have ever referred or will ever refer to Mr. Sheridan or his law firm.

pointedly asked Mr. Sheridan for the amount of the settlement, to which he responded "$44 million dollars."  After I had Mr. Sheridan repeat the amount of the settlement, our conversation ended in less than a minute.  There were no discussions during that telephone conference about how much Mr. Sheridan's law firm would pay my law firm, although I was well aware of the change in the referral agreement that Mr. Sheridan had asked my law firm to make on February 7, 2018, to help James and Kay Burgess continue to have an economically viable lawsuit.

65.    Sheridan and Murray, LLC has since posted the following announcement on their website:  "A $44,000,00 settlement was successfully negotiated with five (5) companies on behalf of our clients, James and Kay Sharon Burgess."  (Exhibit I).

66.    Contrary to the express representations of Sheridan and Murray, LLC and Thomas W. Sheridan to the Court,[9] I did not wait until days after learning of the global settlement to express my concerns about whether my law firm was being treated fairly in this situation.  As soon as I arrived at my office the next morning, December 19, 2018, I called Mr. Sheridan and told him that I did not think that my law firm was being treated fairly in the contemplated division of the attorney's fee earned in the Burgess case.  I specifically told him that I was concerned about the circumstances promptly him to call me on February 7, 2018, and his request that my law firm forego most of its attorney's fee to help James and Kay Burgess continue to have an economically viable lawsuit for him to pursue.[10]  Mr. Sheridan told me in that telephone conference on December 19, 2018, that he would think about what I had said and that we "would revisit the issue."

67.    After I concluded my telephone conference with Mr. Sheridan on December 19, 2018, I convened a meeting in my office with the members of my law firm who had started working

---

[9] *See* Paragraph Nos. 24 and 34 of Plaintiffs' Complaint for Declaratory Relief [Docket No. 1].
[10] *See* Exhibit L at Roberts_000043.

on James and Kay Burgess's case in the spring of 2013.  I informed them of the settlement and the change in the referral fee agreement, which I had confirmed by email to Mr. Sheridan on February 7, 2018, (Exhibit H at Roberts_000030 – Roberts_000031).  I then forwarded that email to those members of my firm.  Later that day a member of my staff brought to my attention that this email contained a thread of emails exchanged between Mr. Sheridan and his partner, Neil Murray (Exhibit H at Roberts_000031 – Roberts_000034).  It did not appear that this thread of emails exchanged between Mr. Sheridan and Mr. Murray were intended to be shared with me.  In that thread, Mr. Sheridan asked Mr. Murray to review the email that he was drafting to send to me to confirm the change in our referral agreement.  Mr. Sheridan wrote in his email to Mr. Murray: "I want to nail this down ASAP."  (*See* Exhibit H at Roberts_000033).  The urgency with which Mr. Sheridan wanted to confirm the change in our referral agreement, was not consistent with the gloomy prospects for the lawsuit that he was still willing to undertake after we changed our referral agreement.

68.     After waiting two weeks to hear back from Mr. Sheridan, I sent him a letter on January 4, 2019 (Exhibit L).  In that letter I reminded Mr. Sheridan of his telephone call on February 7, 2018, in which he "requested that my law firm forego most of its attorney's fee to help James and Kay [Burgess] continue to have an economically viable lawsuit" for him to pursue.  In addition, I specifically asked Mr. Sheridan:

> "What did you know when you called on February 7, 2018, and
> requested that my firm forego most of its attorney's fee so that you
> would still have an economically viable lawsuit to pursue for James
> and Kay Burgess?  More specifically, did you fully and fairly
> disclose all important information about their case to me before

requesting that I change our original agreement that my firm would

be paid 40% of the gross attorney's fee?"[11]

69.     Mr. Sheridan responded by letter dated January 9, 2019 (Exhibit M).  At no point in Mr. Sheridan's three-page letter did he actually deny that we had changed our agreement on February 7, 2018, at his request and based upon his representations to me.  Instead, he assured me in his letter me that his dealings with me "were totally above-board and in no way an attempt to mislead you."  He wrote in justification of changing our agreement that he "was about to embark upon an undertaking which required the commitment of all the financial and human resources of my firm."  He then described in his letter the challenges that he was facing on February 7, 2018, when "we unequivocally agreed to a referral fee limited to $320,000.00 on the claim against Clark Electric."  He even attached a letter from the underlying Burgess case that described the large amount of work and expense that he was purportedly undertaking to justify our changing our referral agreement on February 7, 2018.[12]  In addition, Mr. Sheridan reminded me in his letter that I was "delighted to agree" to a $320,000.00 referral fee in our telephone conference on February 7, 2018.  As I anticipated, Mr. Sheridan also contended in that letter that, when our email exchange occurred on February 7, 2018 (Exhibit H), we unequivocally agreed to change our referral fee agreement to limit my firm's fee to $320,000,00.[13]  Mr. Sheridan never suggested in that letter that his email of September 11, 2014 (Exhibit D), his accompanying letter of September 11, 2014 (Exhibit E), or the Consents to Refer executed by James and Kay Burgess (Exhibit G), all of which

---

[11] Exhibit L at Roberts_000044.
[12] Exhibit M at Roberts_000059 – Roberts_000063.
[13] Exhibit M at Roberts_000057 ("On February 7, 2018, when our email exchange occurred and we unequivocally agreed to a referral fee limited to $320,000.00 on the claim against Clark Electric, . . . .").

reflected that my law firm was to be paid 40% of the gross or total attorney's fee, were mistakenly drafted and incorrectly reflected our original agreement.

70.    My letter of January 4, 2019 also stated:

> "It is my sincere desire to resolve my concerns in a prompt, professional, and amicable manner.  If we cannot resolve my concerns between ourselves, it is my understanding that your Rules of Professional Conduct admonish you to conscientiously consider submitting this matter to the arbitration or mediation procedures established by our bar associations and I am amenable to that process."[14]

Nonetheless, Mr. Sheridan's counsel served me with his Complaint for Declaratory Relief on February 1, 2019.

71.    When I reviewed the Complaint for Declaratory Relief, I immediately noticed that Mr. Sheridan had changed his account of what had occurred on February 7, 2018.  Mr. Sheridan was no longer contending that we agreed in our communications on February 7, 2018, to change our original referral fee agreement made on September 10, 2014.  Mr. Sheridan is now contending that the referral agreement made on September 10, 2014, always limited my referral fee to only 40% of the attorney's fee recovered from only one defendant,[15] and that he had only called me four years later on February 7, 2018, to confirm that understanding.[16]  More specifically, Mr. Sheridan is now contending in his Complaint for Declaratory Relief that he simply called me on

---

[14] Exhibit L at Roberts_000045.
[15] *See* Paragraph Nos. 14 and 15 of Plaintiffs' Complaint for Declaratory Relief [Docket No. 1].
[16] *See* Paragraph Nos. 16-20 of Plaintiffs' Complaint for Declaratory Relief [Docket No. 1].

February 7, 2018, to confirm that I understood that he "mistakenly and incorrectly"[17] drafted his letter of September 11, 2014, to state that my law firm would be paid "forty percent (40%) of the gross attorney's fee."  Mr. Sheridan is no longer contending that in his telephone call to me on February 7, 2018, that he had been "totally above-board" with me, that he had in no way attempted to "mislead" me, that he was justified in changing our agreement because he "was about to embark upon an undertaking which required the commitment of all the financial and human resources" of his firm, or that he needed to change our agreement because he was facing enormous challenges in going forward with the lawsuit.  I can only assume that Mr. Sheridan changed his account of what occurred on February 7, 2018, to shift this Court's focus away from what he knew on February 7, 2018, and to what was said in our telephone conference on September 10, 2014.

72.     In reviewing Mr. Sheridan's Complaint for Declaratory Relief, I also noticed that Mr. Sheridan omitted an email that was intertwined with the other emails and letter that he attached to his Complaint for Declaratory Relief.  The Complaint alleges that his letter of September 11, 2014, which stated that my law firm would be paid forty percent (40%) of the gross attorney's fee, was "mistakenly and incorrectly" drafted and that he never signed that letter.[18]  Mr. Sheridan's Complaint omitted Mr. Sheridan's email (Exhibit D), which accompanied his letter of September 11, 2014, and which stated:  "I have attached a letter to you acknowledging your referral of these matters to me and my firm and our commitment to pay a 40% referral fee."  This email confirms that Mr. Sheridan was aware of the contents of that letter, which states that he was agreeing to pay a 40% referral fee, and that he was paying that referral fee on more than one matter.

---

[17] *See* Paragraph No. 15 of Plaintiffs' Complaint for Declaratory Relief [Docket No. 1].
[18] *See* Paragraph Nos. 15 and 16 of Plaintiffs' Complaint for Declaratory Relief [Docket No. 1].

73.     Mr. Sheridan's contemporaneous letter of September 11, 2014 (Exhibit E), his accompanying contemporaneous email of September 11, 2014 (Exhibit D), and the Consents to Refer (Exhibit G), which were also contemporaneously executed by James and Kay Burgess, correctly reflect that on September 10, 2014, Mr. Sheridan agreed that my law firm would be paid "forty percent (40%) of the gross attorney's fee recovered by Sheridan and Murray for its representation of both Mr. and Mrs. Burgess."   These three documents, which were all contemporaneously drafted in 2014 and long before the settlement in 2018, were not "mistakenly and incorrectly" drafted.

74.     When I wrote to Mr. Sheridan on January 4, 2019 (Exhibit L) to express my concerns, I asked Mr. Sheridan to comply with Rule 1.15 of the Pennsylvania Rules of Professional Conduct by placing 40% of the gross attorney fees in escrow until the appropriate division of the attorney fees between our law firms was resolved.   I do not know whether Mr. Sheridan has complied with my request, and if so, to what extent.   We did not agree that these attorney fees would be placed in an escrow account located in Pennsylvania, and to the extent he deposited these funds into an escrow account in Pennsylvania, he did so unilaterally.

75.     In summary, Mr. Sheridan and I agreed on September 10, 2014, that my law firm would be paid 40% of the gross attorney's fee recovered by Sheridan and Murray through its representation of James and Kay Burgess.  This original referral agreement was reduced to writing in his email of September 11, 2014 (Exhibit D), his letter of September 11, 2014 (Exhibit E), and each of the two Consents to Refer executed by James and Kay Burgess on September 16, 2014 (Exhibit G).  Based upon Mr. Sheridan's representations to me in his telephone call on February 7, 2018, I agreed to change our original referral agreement of September 10, 2014, to help James and Kay Burgess continue to have an economically viable lawsuit.

76.     Because I was heavily involved in some toxic tort litigation in the Eastern District of Texas at the time, I did not ask Mr. Sheridan for the opportunity to co-counsel the lawsuit that Mr. Sheridan would be filing on behalf of James and Kay Burgess.  Moreover, Mr. Sheridan never told me that he would refuse to co-counsel that lawsuit with me, if I were to request that opportunity.

77.     Mr. Sheridan has always been aware that I would do almost anything to help my clients.  Clark Electrical Contractors, Inc. was denying liability, but even if they eventually settled, I was concerned that James and Kay Burgess would not receive anything out of a settlement.  This was a real possibility because of the growing workers' compensation insurance lien and the refusal of the workers' compensation insurance carrier to discount its lien.  Under such circumstances, only the workers' compensation carrier and the attorneys would benefit from a settlement, and it would not have been economically worthwhile for James and Kay Burgess to go forward with a lawsuit.  Since such an outcome was a real possibility, I offered to refund a portion of my firm's attorney fees to James and Kay Burgess to ensure that they and Mr. Sheridan had an economically viable lawsuit.  More specifically, I offered to refund a portion of my firm's attorney fees to James and Kay Burgess if: (1) their gross financial recovery was limited to the $2,000,000.00 in insurance coverage available to Clark Electrical Contractors, Inc., and (2) the workers' compensation lien consumed their portion of the recovery.  My offer contemplated that under such circumstances: (1) Mr. Sheridan and his law firm would retain their portion of the attorney fees for obtaining the settlement, (2) my law firm would refund the referral fee it received on James Burgess' injury claim to James Burgess, and (3) my law firm would retain the referral fee it received on Kay Burgess' loss of consortium claim to partially compensate my law firm for the work it had performed on behalf of James and Kay Burgess in 2013 and 2014.  There is no prohibition in Texas

on attorneys refunding their fees to help out a client.  I explained this offer in a conversation with Mr. Sheridan and a separate conversation with James and Kay Burgess.

78.    My investigator, Blane Carrifee, was present when I explained to James and Kay Burgess the terms of my offer to refund a portion of my firm's referral fee to them and when I explained to James and Kay Burgess the terms of my referral agreement with Mr. Sheridan.  Mr. Carrifee, who recently underwent cancer surgery, has announced his plans to retire and move to Dallas, Texas to be near some of his grandchildren.

I reserve the right to continue to amend this Declaration to provide additional facts as they are needed to rebut Mr. Sheridan's changing account of what occurred in this situation.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 28,  2019.

RANDELL C. ROBERTS

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHERIDAN AND MURRAY, LLC and
THOMAS W. SHERIDAN,

          Plaintiffs,

     v.

ROBERTS AND ROBERTS, and
RANDELL C. ROBERTS,

          Defendants.

Civil Action No. 19-467 (RBS)

**DEFENDANTS' AMENDED EXHIBIT LIST\***
**IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS FOR LACK OF PERSONAL**
**JURISDICTION OR, IN THE ALTERNATIVE,**
**MOTION TO TRANSFER VENUE TO THE EASTERN DISTRICT OF TEXAS**

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Contracts for Legal Services entered into by James and Kay Burgess and Roberts & Roberts in Texas on January 31 and March 19, 2013 respectively. |
| B | Sheridan's follow-up email to Roberts on November 15, 2013, after they had met at the seminar in Napa, California, and which invited Roberts to "call to discuss the case." |

\*All but two of these exhibits were previously submitted with Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.  They are resubmitted now in a version that is highlighted in yellow to draw the Court's attention to the relevant portions of the documents.  It may be helpful to use this complete set of exhibits when reading Defendants' Motion to Dismiss and Reply as well as the Second Amended Declaration of Randell C. Roberts.  Moreover, the Second Amended Declaration of Randell C. Roberts is identical to his preceding Declaration, with the addition of Paragraph Nos. 76, 77, and 78.  Reference to the Second Amended Declaration of Randell C. Roberts and Defendants' Amended Exhibit List will provide the Court with the facts and documents supporting Defendants' Motion to Dismiss and Reply.

| C | Sheridan's email to Roberts on February 7, 2014 stating that Sheridan would like to investigate the case further. |
|---|---|
| D | Sheridan's email to Roberts on September 11, 2014, which followed up on his telephone conference with Roberts the preceding day, and which attached Sheridan's letter of September 11, 2014 and his law firm's contracts for James and Kay Burgess to sign in Texas, and which also confirmed the 40% referral fee as described in Sheridan's accompanying letter. |
| E | Sheridan's letter of September 11, 2014, which confirmed that his law firm would pay Roberts "a referral fee in the amount of forty percent (40%) of the gross attorney's fee recovered by Sheridan and Murray for its representation of both Mr. & Mrs. Burgess." |
| F | Sheridan and Murray, LLC's Standard Engagement Agreements and Powers of Attorney executed by James Burgess and Kay Burgess in Texas on September 16, 2014. |
| G | Consents to Refer executed by James and Kay Burgess in Texas on September 16, 2014, which confirmed their understanding and agreement that Roberts & Roberts would be paid 40% of the total attorney's fee. |
| H | Sheridan's email to Roberts on February 7, 2018, which was sent after Sheridan's call to Roberts earlier that afternoon, and which included an email thread between Sheridan and his partner in which Sheridan stated that he wanted to "nail this down ASAP" with Roberts. |
| I | Sheridan and Murray, LLC's announcement on its website: "A $44,000,00 settlement was successfully negotiated with five (5) companies on behalf of our clients, James and Kay Sharon Burgess." |
| J | Sheridan's email to Roberts on November 14, 2018, in which Sheridan advised Roberts that they had "not yet settled" the Burgess case. |
| K | Media report on Law.com dated November 27, 2018 reporting that Sheridan had obtained a $44,000,000 settlement for James and Kay Burgess. |
| L | Roberts' letter of January 4, 2019 (with accompanying attachments) to Sheridan |
| M | Sheridan's letter of January 9, 2019 (with accompanying attachments), which responded to Roberts' letter of January 4, 2019 |
| N | Complete copy of initial email chain between Sheridan and Roberts in which Sheridan requested file materials and the initial telephone conference on December 3, 2013 to discuss how Sheridan might help with the case. |
| O | Roberts' Petition for Rule 202 Pre-Suit Deposition in Texas of the corporate representative of James Burgess' Texas employer, Patterson-UTI Drilling Company LLC, and accompanying letter providing Clark Electrical Contractors, Inc. with notice of the Texas proceedings. |